## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**TEOFILO RIVERA-ANDALUZ**,
    Petitioner,

    v.

**COMMISSIONER OF SOCIAL
SECURITY**,
    Defendant.

Civil No. 18-1298 (BJM)

### OPINION AND ORDER

Teofilo Rivera-Andaluz ("Rivera") moves to reverse the Commissioner of the Social Security Administration's ("the SSA's") decision to redetermine and terminate his Social Security Disability Insurance benefits ("SSDI"). Dkt. 22. The SSA defended its decision. Dkt. 26. The case is before me by consent of the parties. Dkts. 4, 5.

For the following reasons, the SSA's decision is **AFFIRMED.**

### STANDARD OF REVIEW

The court's review of Social Security disability cases is limited to determining whether the Commissioner employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro v. Secretary of Health & Human Services*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C. § 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v. Secretary of Health & Human Services*, 955 F.2d 765, 769 (1st Cir. 1991). "Substantial evidence means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Visiting Nurse Association Gregoria Auffant, Inc. v. Thompson*, 447 F.3d 68, 72 (1st Cir. 2006) (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) ("[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high."). The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a

different conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán v. Secretary of Health & Human Services*, 819 F.2d 1, 3 (1st Cir. 1987). After reviewing the pleadings and record transcript, the court has "the power to enter a judgment affirming, modifying, or reversing the decision of the Commissioner." 42 U.S.C. § 405(g).

A claimant is disabled under the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when he "is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, the adjudicator must consider all evidence in the record. 20 C.F.R. § 404.1520(a)(3).

Generally, the Commissioner must employ a five-step evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520; *see Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987); *Goodermote v. Secretary of Health & Human Services*, 690 F.2d 5, 6–7 (1st Cir. 1982). In step one, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At step two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(c). If not, the disability claim is denied. At step three, the Commissioner must decide whether the claimant's impairment is equivalent to a specific list of impairments contained in the regulations' Appendix 1, which the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1. If the claimant's impairment meets or equals one of the listed impairments, he is conclusively presumed disabled. If not, the evaluation proceeds to the fourth step, through which the Administrative Law Judge ("ALJ") assesses the claimant's residual functional capacity ("RFC") and determines whether the impairments prevent the claimant from doing the work he

has performed in the past. An individual's RFC is his ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e) and 404.1545(a)(1). If the claimant can perform his previous work, he is not disabled. 20 C.F.R. § 404.1520(e). If he cannot perform that work, the fifth and final step asks whether the claimant can perform other work available in the national economy given his RFC, age, education, and work experience. If the claimant cannot, then he is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

At steps one through four, the claimant has the burden of proving he cannot return to his former employment because of the alleged disability. *Santiago v. Secretary of Health & Human Services*, 944 F.2d 1, 5 (1st Cir. 1991). Once a claimant meets this burden, the Commissioner has the burden under step five to prove the existence of other jobs in the national economy the claimant can perform. *Ortiz*, 890 F.2d at 524. Additionally, to be eligible for disability benefits, the claimant must demonstrate that his disability existed prior to the expiration of his insured status, or his date last insured. *Cruz Rivera v. Secretary of Health & Human Services*, 818 F.2d 96, 97 (1st Cir. 1986).

Rather than requesting review of an initial determination, Rivera appeals a redetermination. "The Commissioner of Social Security shall immediately redetermine the entitlement of individuals to monthly insurance benefits under this subchapter if there is reason to believe that fraud or similar fault was involved in the application of the individual for such benefits." 42 U.S.C. § 405(u)(1)(A). The SSA may have reason to believe fraud or similar fault occurred through its own investigations or through referral of an investigation by the OIG. *See, e.g.*, 42 U.S.C. § 1320a–8(l). "Similar fault" exists when either "an incorrect or incomplete statement that is material to the determination is knowingly made" or "information that is material to the determination is knowingly concealed." *Id.* § 405(u)(2). "When redetermining the entitlement, or making an initial determination of entitlement, of an individual under this subchapter, the Commissioner of Social Security shall disregard any evidence if there is reason to believe that fraud or similar fault was involved in the providing of such evidence." 42 U.S.C. § 405(u)(1)(B).

The Appeals Council, which issues the final administrative determination on social security cases, defines its procedures and guiding principles in the Hearings, Appeals and Litigation Law

manual ("HALLEX").[1] HALLEX does not provide substantive rules nor does it interpret statutes as Social Security Rulings do, so it is not entitled to deference. It does, however, illustrate the recommended approach ALJs and the Appeals Council take in redetermination cases. *See Moore v. Apfel*, 216 F.3d 864, 869 (9th Cir. 2000) (declining to apply *Chevron* deference to HALLEX); *but see Hicks v. Comm'r of Soc. Sec.*, 909 F.3d 786, 807 n.9 (6th Cir. 2018) (presuming HALLEX guidelines were "interpretive rules" after the SSA so alleged); *see also Taylor v. Berryhill*, Civ. No. 16-044, 2018 WL 1003755, at *16–17 (W.D. Va. Feb. 21, 2018) (deferring to Social Security Rulings and noting HALLEX constitutes "distinct guidelines" for redetermination procedures).

HALLEX states that a redetermination "based on fraud or similar fault is a re-adjudication of the individual's application for benefits." HALLEX I-1-3-25(A) (updated Feb. 25, 2016). The ALJ charged with redetermining a claim may consider evidence initially submitted as well as new, material evidence that does not involve fraud or similar fault and is related to the period at issue. *Id.* An ALJ generally decides "whether to disregard evidence based solely on whether there is reason to believe similar fault was involved," but an ALJ assigned to redetermine a claim may also be instructed to disregard certain evidence. *Id.* at I-2-10-10(A), Note 1 (updated June 25, 2014). Evidence to be considered can be divided between initial evidence, submitted for the original claim, and new evidence that a beneficiary may submit for the redetermination. Pursuant to § 405(u)(2), the adjudicator *must* disregard any information from an OIG referral which resulted in a finding of fraud or similar fault. *See id.* at I-1-3-25(C)(4)(a). "[A]djudicators do not have discretion to reconsider the issue of whether the identified evidence should be disregarded when based on an OIG referral of information." *Id.*; *see also* SSR 16-1p, 81 Fed. Reg 13436 (March 14, 2016). Redeterminations based on SSA findings of fraud or similar fault, however, are treated differently, and adjudicators retain discretion to consider the beneficiary's objection to disregarding certain evidence. HALLEX I-1-3-25(C)(4)(a). A beneficiary may submit additional evidence if it is "new, material, and related to the time period at issue." *Id.* at I-1-3-25(C)(4)(c).

---

[1] HALLEX, the Hearings, Appeals and Litigation Law manual, can be located online at https://www.ssa.gov/OP_Home/hallex/hallex.html.

The time period at issue in a redetermination runs from the disability onset date through the date of the final benefits determination. *Id.* at I-1-3-25(C)(3). The onset date is the date determined by the SSA, rather than the date declared by the beneficiary on his initial application for benefits. "Evidence that post-dates the original determination or decision can relate to the period at issue if it is reasonably related to the time period originally adjudicated." *Id.* at I-1-3-25(C)(4)(c). The adjudicator then determines, based on the eligible evidence, whether the beneficiary was or was not entitled to benefits at the time of the original determination.

Should the Commissioner determine "that there is insufficient evidence to support such entitlement, the Commissioner of Social Security may terminate such entitlement and may treat benefits paid on the basis of such insufficient evidence as overpayments." 42 U.S.C. § 405(u)(3).

## BACKGROUND

The following is a summary of the treatment record, consultative opinions, self-reported symptoms and limitations as contained in the Social Security transcript and case history.

Rivera was born on October 20, 1970. Ex. 1E at 1. He completed eighth grade and began working at age 17. Ex. 4D at 1; Ex. 2E at 3; Dkt. 22 at 1. By trade, Rivera operated heavy machinery. Transcript ("Tr.") 39. After working for approximately twenty-four years, Rivera developed depression, sleep apnea, high blood pressure, obesity, and gout. Ex. 4D at 1–2; Ex. 4F at 11; Ex. 6F at 16. He stopped working in April 2011, when he reported falling asleep at work on the machinery he operated. Tr. 39; Ex. 2E at 3.

Rivera applied for disability benefits on June 6, 2012, claiming April 14, 2011 as his onset date. Ex. 1D at 1. On his disability report, Rivera listed Dr. Rafael Miguez Balseiro ("Dr. Miguez") as his treating physician. Ex. 2E at 5. State agency psychological consultant Dr. Jesus Soto reviewed Rivera's application and related evidence, including medical reports from Dr. Miguez, and found that the overall evidence supported a diagnosis of severe, major depressive disorder. Ex. 1A at 9. In reaching this conclusion, Dr. Jesus Soto gave Dr. Miguez's opinion "controlling opinion weight because it [was] well supported and consistent with the overall evidence." *Id.* The SSA, on

September 21, 2012, found that Rivera qualified for disability benefits with an onset date of August 1, 2011. Tr. 127.

Eighteen months later, the SSA informed Rivera that it would be suspending his benefits because of fraud or similar fault related to evidence on which it relied in adjudicating his claim. Ex. 4B at 1. The allegation of fraud or similar fault arose out of an investigation into social security claims in Puerto Rico that began in 2009. Dkt. 26-1 ¶ 2 ("Barry Decl."). Employees of the Puerto Rico Disability Determination Service had warned the SSA that some doctors in Puerto Rico were submitting fraudulent medical evidence to support disability benefits claims. *Id.* The SSA referred the information to its OIG, which conducted an investigation alongside the Department of Justice and the Federal Bureau of Investigation ("FBI"). *Id.*; Dkt. 26 at 5. Various individuals were indicted as a result. Barry Decl. ¶ 3.

Among those indicted was a neurologist named Dr. José Hernández-Gonzalez who ultimately pled guilty to conspiracy to make false statements to the SSA. *Id.* ¶ 4. "Dr. Hernández admitted that he would exaggerate medical complaints and symptoms in order to maximize the probability that his patients would be approved for Social Security disability insurance benefits." *Id.* He also admitted to referring patients to doctors who would "exaggerate or fabricate conditions for the patients, in order to strengthen their applications for benefits." *Id.* Rivera's psychiatrist, Dr. Miguez, was one of those physicians. *Id.*

Dr. Miguez himself was also indicted for making false statements to the SSA. Ex. 12B at 48. He ultimately pled guilty to a one-count Information, admitting that he had failed to maintain a cash ledger of monies paid in connection with SSA medical visits without the intent to defraud the United States. Ex. 12B at 75. The false statements charges against him were thereafter dismissed. Tr. 64.

The SSA's response to these indictments proceeded in stages. First, it assembled a special team, the New York Fraud Prevention Unit ("FPU"), to review the nearly 7,000 cases containing evidence from those indicted. Barry Decl. ¶ 5. These adjudicators disregarded evidence provided by those who had been criminally charged and then determined whether sufficient evidence

remained to support each beneficiary's benefits. *Id.* They determined that 2,000 beneficiaries could no longer support their benefits allowances. *Id.* Next, the SSA suspended these individuals' benefits, notified them that their claims were being redetermined, and gave them ten days to submit additional evidence. *Id.* ¶ 6. On redetermination, adjudicators disregarded evidence from sources who had been criminally charged, examined any new evidence submitted, and then determined whether a beneficiary qualified for benefits. *Id.* ¶ 7. If an adjudicator determined that a beneficiary no longer qualified for benefits, the SSA notified the beneficiary and provided an opportunity to appeal the decision. *Id.* ¶ 8.

In June 2015, the SSA introduced another phase in the redetermination process for beneficiaries who had submitted evidence from Dr. Miguez. On June 19, 2015, OIG sent a memorandum to the SSA Acting Deputy General Counsel explaining that Dr. Miguez had pled guilty to a one-count Information and that charges against him for false statements to the SSA had been dismissed. Tr. 64. OIG also explained that it had "reason to believe that fraud was involved with medical evidence submitted by [Dr. Miguez]." Tr. 65. The SSA determined that because "OIG did not identify specific disability claimants or, evidence submitted, supplied, or sourced by [Dr. Miguez] that would have required the agency to automatically disregard that evidence," it would review cases involving Dr. Miguez again "using SSR 00-2p to determine if fraud or similar fault was involved." Tr. 62. Under that directive, the SSA itself, rather than OIG, would conduct the fraud or similar fault analysis. *See* SSR 16-2p, 81 Fed. Reg. 13439 (March 14, 2016).[2] The SSA therefore remanded 903 redetermination cases, including Rivera's, for further review. Barry Decl. ¶ 9.

For Rivera, this process meant that his claim was approved, redetermined, and denied after a fraud finding by OIG, then redetermined and denied based on a fraud finding by the SSA. More particularly, after Dr. Miguez was indicted, SSA initiated redetermination of Rivera's claim. On April 2, 2014, state agency psychiatric consultant Dr. Carlos Jusino-Berrios reviewed Rivera's

---

[2] SSR 16-2p rescinded and replaced SSR 00-2p effective March 14, 2016.

application. Ex. 3A at 8. After excluding evidence from Dr. Miguez because he was a "discredited medical source," Dr. Jusino-Berrios concluded that Rivera's allegations were "not credible." *Id.* On April 4, the agency sent Rivera a letter explaining that his claim was being redetermined because of suspected fraud or similar fault and that his benefits would be suspended during redetermination. Ex. 4B at 1. The same letter informed Rivera that he had 10 days to respond. *Id.* Rivera submitted new evidence on April 25, including medical records from APS Clinics of Puerto Rico (APS), where he had received treatment for depression. Ex. 5F at 21–36. On June 17, Dr. Jusino-Berrios reviewed Rivera's claim again in light of the new evidence and affirmed his prior findings. Ex. 3A at 6. On June 18, the SSA informed Rivera that it had determined he was not disabled, and Rivera sought review. Ex. 5B at 1; Ex. 9B. On review, state agency psychologist Dr. H. Rozelman affirmed the prior assessment. Ex. 5A at 7. On August 5, the SSA informed Rivera that his claim was denied, and Rivera again requested reconsideration, a request which the agency treated as a request for hearing with an ALJ. Ex. 10B at 1; Ex. 11B; Dkt. 26 at 8.

Meanwhile, the SSA had determined it would informally remand redetermination cases involving Dr. Miguez for review under the SSA's fraud and similar fault rules. Tr. 62; Barry Decl. ¶ 9. As such, on November 18, 2015, the SSA conducted a special determination to decide whether fraud was involved in Rivera's benefits application. *See* Ex. 8A. A disability specialist in a fraud prevention unit examined Dr. Miguez's medical report and compared it to the facts involved in an undercover investigation conducted by the FBI. *Id.* at 2 Id. at 2–4. In that investigation, an undercover operative visited Dr. Hernández-Gonzalez who referred her to Dr. Miguez. She then told Dr. Miguez that she had come to see him to earn money. *Id.* at 2. She did not discuss suffering from depression with Dr. Miguez, but she ultimately received a report from him for use in an SSDI claim based on depression. *Id.* at 2–4. The disability specialist noted several similarities between the disability report Dr Miguez gave Rivera and that provided to the undercover operative: both reports discussed lack of concentration, forgetfulness, low tolerance to stress, sleep problems, isolation, poor personal hygiene, severely depressed mood, problems with immediate and short-term memory but not remote memory, attention difficulties, poor social functioning, and inability

to manage funds, among other similarities. *Id.* at 4. The specialist further determined that Dr. Miguez's medical report was inconsistent with the other evidence in Rivera's file and concluded that there was reason to believe that the report involved fraud or similar fault. *Id.* at 4–5.

On October 14, 2016, the SSA sent Rivera a letter acknowledging his request for a hearing with an ALJ and explaining what would occur at the hearing. Ex. 13B. The letter explained that the SSA "must disregard" evidence from certain physicians, not including Dr. Miguez, and that evidence from Dr. Miguez "must be considered under our rules regarding fraud or similar fault." Ex. 13B at 5. The letter further explained that Rivera could present his case to an ALJ who would consider the issues Rivera raised, the evidence in Rivera's file, and any additional evidence Rivera submitted about the relevant time period. Ex. 13B at 6. Additionally, the letter explained that Rivera's file contained information from Dr. Miguez and that the ALJ would "consider if this information shows that fraud or similar fault was involved in providing evidence in your case." *Id.* If so, the evidence from Dr. Miguez would be disregarded. *Id.* On March 1, 2017, the SSA sent Rivera notice of his hearing date with an ALJ, which explained that evidence from Dr. Miguez "must be considered under our rules regarding fraud or similar fault." Ex. 14B at 9. Rivera acknowledged receipt of this notice on March 8. Ex. 15B. On June 6, Rivera appeared along with counsel at a hearing before ALJ Richard Grippo. Tr. 33.

In Rivera's initial disability report, he informed the SSA that he had stopped working due to depression. Ex. 2E at 2. According to his July 2012 function report, Rivera's condition affected his memory, concentration, and ability to understand, complete tasks, and follow instructions. Ex. 3E at 16. Rivera reported that he could follow spoken instructions if they were repeated several times, and he needed help to follow written instructions. *Id.* Additionally, Rivera submitted that he did not like changes in routine, and he handled stress "with medication." *Id.* at 17. He also reported that he could not sleep, he was not interested in dressing or bathing himself, and someone helped him with shaving. *Id.* at 12. He needed reminders to attend to personal needs, his wife prepared his meals and did the shopping, he could not perform other household chores, and he could not manage money due to forgetfulness. *Id.* at 13–15. Rivera also submitted that he could not drive

because of his medications, he could not go out alone, and he only regularly left home to go to doctor's appointments. *Id.* at 14. Although Rivera reported that he did not spend time with others, he also stated that he had no problems getting along with family, friends, neighbors, and authority figures. *Id.* at 15–17. Rivera did not check boxes to report any physical limitations, although the form lists potential limitations related to getting up, squatting, bending, standing, reaching, walking, sitting, kneeling, and climbing stairs. *Id.* at 16.

Rivera supported his initial claim with a psychiatric medical report from Dr. Miguez. *See* Ex. 1F. According to the report, Rivera sought treatment with Dr. Miguez on February 28; April 17; May 30; and July 18, 2012. Ex. 1F at 6. Dr. Miguez noted that Rivera suffered from psychomotor retardation, difficulty organizing his thoughts and maintaining attention, poor social functioning, fearfulness, irritability, isolation, and very poor stress tolerance. Ex. 1F at 7–9. The report included a diagnosis of major severe depressive disorder recurrent with anxiety and a "very poor" prognosis, with a Global Assessment Functioning ("GAF") score[3] of 40–45. *Id.* at 10. Prior to his hearing before the ALJ, Rivera also submitted treatment notes from Dr. Miguez, dated from February 28, 2012 to July 16, 2013. Ex. 10F.

Rivera also submitted medical records from APS, where he received treatment for a mental impairment. At Rivera's initial visit with APS on November 22, 2011, Rivera reported that he fell asleep everywhere and could not drive. Ex. 5F at 35. Dr. Celia Rodríguez Valdez, an APS psychiatrist, noted that Rivera appeared alert, oriented and cooperative, recorded an initial diagnosis of depressive disorder not otherwise specified, prescribed Wellbutrin, and referred Rivera to a psychologist and psychiatrist for further treatment. Ex. 5F at 18, 36. From January to November 2012, APS physicians reported that Rivera appeared clean, alert, and calm; his thoughts logical, coherent, relevant, and oriented; and his affect, introversion, judgment and sleep adequate.

---

[3] GAF is a scale from 0 to 100 used by mental health clinicians and physicians to subjectively rate the social, occupational, and psychological functioning of adults. A GAF score ranging from 41 to 50 indicates "serious symptoms" or any "serious impairment in social occupational, or school functioning." A GAF score between 51 and 60 indicates "moderate symptoms" or "moderate difficulty in social occupational, or school functioning." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. text rev. 2000) (DSM–IV–TR).

*Id.* at 21, 23, 25, 27, 29, 31. None reported that his mood was "depressed." *Id.* They assigned him GAF scores ranging from 60 to 65. Ex. 5F at 21, 23, 25, 27, 29, 31, 33. In December, an APS physician again reported that Rivera was clean, alert, and calm and that his thoughts were logical, coherent, relevant, and oriented. *Id.* at 33. This progress note also reported, however, that Rivera's affect was muddled, his introversion and judgment poor, and his sleep altered. *Id.* Throughout Rivera's treatment, APS physicians continued referring Rivera to an outside psychologist, a referral which Rivera abided by seeing Dr. Miguez. *Id.* at 22, 26, 28, 30; Tr. 47.

Rivera also submitted medical records related to physical impairments, including sleep apnea, high blood pressure, obesity, and gout. In 2008, Rivera sought treatment for sleeplessness and reported a car accident after falling asleep. Ex. 4F at 37. He saw a physician at COSSMA, a medical group, who noted that Rivera suffered from high blood pressure, obesity, and a possible sleep disorder. *Id.* In January 2012, Dr. Rosalie Candelario Ortiz with COSSMA diagnosed Rivera with hypertension, obesity, depression with anxiety, and organic insomnia. Ex. 4F at 22. She also noted that Rivera could not work as a machinist because he was falling asleep during the day. Ex. 4F at 21–22. At a follow-up visit in February, Rivera again reported ongoing sleepiness. Ex. 6F at 13. In March, Rivera completed a sleep study which demonstrated that he had severe obstructive sleep apnea. Ex 3F at 2, 23. Dr. Candelario confirmed a diagnosis of obstructive sleep apnea, and a device providing continuous positive airway pressure through the night ("CPAP") was prescribed. Ex. 3F at 14; Ex. 6F at 10. Rivera sought further treatment with sleep medicine specialist Dr. Luis Alfredo de Jesus Vargas, who diagnosed severe obstructive sleep apnea, shortness of breath, essential arterial hypertension, allergic rhinitis, and gout arthropathy, and noted that Rivera was seeing Dr. Miguez for depression. Ex. 3F at 30, 75. In August and October, Rivera informed Dr. de Jesus that he was removing the CPAP during the night due to discomfort. *Id.* at 61, 67. Dr. de Jesus noted that the mask on the CPAP was leaking and prescribed a change in mask size. *Id.* at 55, 62. In December, Rivera reported that he slept roughly five to six hours per night and continued to suffer from daytime sleepiness after partial use of the CPAP. *Id.* At 49. At a follow-up visit in October 2013, Rivera reported that he no longer suffered from daytime sleepiness. *Id.*

Rivera-Andaluz v. Commissioner of Social Security, Civil No. 18-1298 (BJM)                                    12

at 34. In addition to documentation related to sleep apnea, Rivera submitted medical records reflecting that he suffered from obesity, high blood pressure, and gout. Ex. 4F at 19–22, 26–28, 33–37; Ex. 6F at 10. These records do not include physicians' opinions regarding physical limitations related to these conditions, although they reflect that Rivera was advised to increase physical activity, maintain a healthy diet, and lose weight. Ex. 4F at 20, 22.

In his hearing before the ALJ, Rivera testified that he had worked as an operator of heavy machinery but that he stopped working because he had developed sleep apnea and was falling asleep while on the machinery. Tr. at 39, 43. He also testified that gout and depression contributed to his having to stop working. *Id.* at 39. Rivera explained that he sought treatment for depression with both Dr. Miguez and APS. He visited with Dr. Miguez for appointments that lasted between 45 minutes and one hour, during which time Dr. Miguez would give him advice. *Id.* at 40. In contrast, his appointments at APS lasted 10 to 15 minutes, during which time Rivera would receive a prescription to treat his depression. *Id.* at 41. Rivera also testified that his high blood pressure made him feel "down, unmotivated," that his gout was located in his knees, ankles, and toes, which he used to operate heavy machinery, that it made his joints swell, and that it made him feel as if he could not move. *Id.* at 42–43. When questioned about his CPAP treatment for sleep apnea, Rivera reported that his sleep had "improved somewhat" with treatment. *Id.* at 43. Rivera also explained that between April 2011 and September 2012 he could brush his own teeth, bathe himself but sometimes needed assistance, and would pass the time by watching television, although he sometimes fell asleep. *Id.* at 44. He also stated that his wife did the cooking, he could not drive because of drowsiness, and that his household chores consisted of moving things when his wife asked him to. *Id.* at 45. The ALJ questioned Rivera about his treatment with Dr. Miguez, and Rivera explained that he had contacted Dr. Miguez based on a referral from his neighbor. *Id.* at 47–48.

A vocational expert (VE) testified that Rivera's previous job was that of a heavy equipment operator and required a medium level of physical tolerance. *Id.* at 49. He explained that a hypothetical person of Rivera's age, vocational background, and education could not do Rivera's past work if that person could lift 25 pounds occasionally and 20 pounds frequently; sit for six or

more hours in an eight-hour day; stand or walk for six or more hours in an eight-hour day;
occasionally balance, stoop, kneel, crouch, and crawl; understand, remember, and execute simple,
one or two-step instructions; but never climb ladders, ropes, or scaffolds. *Id.* Such a person could,
however, perform light, unskilled work such as that of a sorter, assembler, or packer. *Id*. at 49–50.
The VE also testified that there would be no jobs for a second hypothetical person who had all the
same characteristics as the first hypothetical person but who could not complete a normal work
week or work day; persist or concentrate; sustain attention for two hours; adjust to changes in the
work environment; interact with coworkers, supervisors, or the public; or understand, remember,
or execute simple tasks. *Id.* at 50. Rivera's counsel did not question the VE. *Id.*

   The ALJ found that Rivera was not disabled at any time from April 14, 2011 to September
21, 2012. In reaching this conclusion, the ALJ disregarded the medical report and treatment notes
from Dr. Miguez, explaining that they were inconsistent with other evidence in the file and showed
indications of fraud or similar fault. *Id.* at 21. The ALJ then proceeded to the five-step analysis
required to determine eligibility for disability benefits. At step one, the ALJ found that Rivera did
not engage in substantial gainful activity during the relevant period. *Id*. at 22. At step two, he found
that Rivera suffered from severe obstructive sleep apnea, essential hypertension, and affective
disorder. *Id.* At step three, he concluded that none of these severe impairments met or medically
equaled the severity of a listed impairment. *Id.* at 22–23. The ALJ then found that Rivera had the
RFC to perform light work, except that he could lift 25 pounds occasionally and 20 pounds
frequently; stand or walk for six hours in an eight-hour workday; sit for six hours; never climb
ladders, ropes, or scaffolds; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and
crawl; and complete simple work with one- or two-step instructions. *Id.* at 24. In reaching these
conclusions, the ALJ credited Rivera's reports regarding his symptoms but not regarding their
severity, gave great weight to the medical and psychological consultants during the
redetermination stages except to their findings that Rivera had moderate restrictions in activities
of daily living and social functioning, and gave no weight to the psychological consultant during
the initial determination, who relied on evidence from Dr. Miguez. *Id.* at 25–26. At steps four and

five, the ALJ determined that Rivera could not perform his prior work as a machinist but that he could perform light work, such as that of a sorter, assembler, or packer, and that such jobs existed in sufficient numbers in the national economy. *Id.* at 26–27.

Rivera appealed the ALJ's decision to the Appeals Council, which also denied his claim. Tr. 1. He then filed the instant complaint, seeking federal district court review of the ALJ's disability determination and challenging related procedures. Dkt. 3.

## DISCUSSION

Rivera contends that the ALJ's decision was not supported by substantial evidence, and argues that the procedures the SSA used violated both the Administrative Procedure Act (APA) and Due Process Clause of the Fifth Amendment. The SSA disagrees on every ground.

Typically, district courts review disability determination to assess whether substantial evidence supports the SSA's decision. 42 U.S.C. § 405(g). Here, Rivera raises additional procedural questions, including a constitutional challenge. I will begin by addressing alleged errors by the ALJ and then address procedural challenges in keeping with the constitutional avoidance doctrine. *See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988); *Vaqueria Tres Monjitas, Inc. v. Pagan*, 748 F.3d 21, 26 (1st Cir. 2014) ("[F]ederal courts are not to reach constitutional issues where alternative grounds for resolution are available.") (internal quotations and citation omitted). Should the SSA lack substantial evidence supporting its decision to deny Rivera's claim, then the court need not reach the constitutional question. If, however, substantial evidence supports the SSA's decision, then I must address the procedure by which that evidence was submitted and considered.

### *Sufficiency of the Evidence*

Rivera argues that the ALJ lacked substantial evidence for (1) his decision to disregard evidence from Dr. Miguez and (2) his determination that Rivera could perform light work.

As to the first contention, Rivera argues that the ALJ's decision to reject evidence from Dr. Miguez was not supported by substantial evidence because the ALJ inaccurately concluded that Dr. Miguez's report and treatment notes were inconsistent with other record evidence.

The parties disagree as to the law applicable to the ALJ's findings regarding evidence from Dr. Miguez. The SSA views the decision as one made under the SSA's rules for fraud and similar fault. Dkt. 26 at 14–15. Rivera frames the issue as how much weight to give a treating physician. Dkt. 22 at 26–27; *see* 20 C.F.R. § 404.1527(c)(1).[4] I will address each view in turn.

When redetermining a claimant's entitlement to benefits, an ALJ must disregard evidence if there is reason to believe that fraud or similar fault was involved in providing that evidence. 42 U.S.C. § 405(u)(1)(B). Similar fault is involved where "an incorrect or incomplete statement that is material to the determination is knowingly made or information that is material to the determination is knowingly concealed." 42 U.S.C. § 405(u)(1)(B). "A finding of similar fault can be made only if there is reason to believe that, based on a preponderance of the evidence, the person committing the fault knew that the evidence provided was false or incomplete. [The SSA] cannot base a finding of similar fault on speculation or suspicion." 81 Fed. Reg. at 13440. To make a similar fault finding, an adjudicator must consider all evidence in the record, apply the preponderance of evidence standard, and "fully document the record with the evidence that was the basis for the finding." *Id.* As explained below, the ALJ failed to comply with procedures for finding fraud or similar fault because he made no findings as to whether any person knew evidence provided was false or incomplete.

To be sure, the ALJ determined that the evidence from Dr. Miguez was "loaded with inconsistencies." Dr. Miguez's report, dated July 22, 2012, stated that Rivera lived alone, while Rivera's disability report, dated July 11, 2012, stated that he lived with his wife and children. Dr. Miguez reported that Rivera's first appointment occurred in February 2012, while Rivera's disability report stated that their first appointment occurred in May 2012. Rivera filled his first prescription from Dr. Miguez in May 2012, a fact the ALJ found inconsistent with Dr. Miguez's report that treatment started in February. The ALJ also believed the medication log demonstrated

---

[4] Rivera's application was filed on June 6, 2012. As such, the regulations at 20 C.F.R. § 404.1527 apply rather than those at 20 C.F.R. § 404.1520c, which apply to claims filed on or after March 27, 2017. *See* Revisions to Rules Regarding Medical Evidence, 82 Fed. Reg. 5844 (January 18, 2017) (rescinding Soc. Sec. Rule. 96-2p, 96-5p and 06-03p).

that Rivera was not filling his prescription for Ativan from November 2012 to April 2013, contradicting Dr. Miguez's treatment summary. Further, Rivera filled two prescriptions to treat his mental health impairment on September 4, 2012, one written by Dr. Miguez and another written by an APS physician, and, because "either physician could have written both prescriptions," the ALJ concluded Rivera "was not being fully candid with both physicians about the treatment he was getting from the other." Tr. at 21–22. Moreover, "Dr. Miguez reported that the beneficiary had poor memory and concentration, that he had negative ideas, and that his illness affected his judgment and insight (Ex. 1F). Yet, contemporaneous evidence from APS showed the beneficiary to be logical, coherent, and with adequate judgment." Based on these "serious inconsistencies," the ALJ disregarded evidence from Dr. Miguez. *Id*. at 22.

Rivera contends that the ALJ erred in finding the evidence from Dr. Miguez inconsistent with other parts of the record. He is correct on some points. First, Rivera accurately points out that the ALJ wrongly concluded that the prescription log showed no Ativan prescriptions (the medication Dr. Miguez was prescribing) from November 2012 to April 2013 and after May 2013. Contrary to what the ALJ found, Rivera was filling this prescription during this time under the name "lorazepam," which is a generic of Ativan. *See* Ex. 8F at 1. Second, Rivera correctly observes that the ALJ overlooked a prescription for Ativan dated September 4, 2012 when he questioned why Rivera filled an Ativan prescription on that date even though Dr. Miguez's treatment notes from that date do not mention any prescription. *See* Ex. 2F at 2. Rivera also properly questions the ALJ's comments regarding whether Rivera was being candid with his physicians. The ALJ took issue with the fact that on one date Rivera filled two prescriptions—a Wellbutrin prescription from APS and an Ativan prescription from Dr. Miguez—yet either physician could have written both prescriptions. The ALJ concluded that these facts suggested Rivera "was not being fully candid with both physicians about the treatment he was getting." Tr. 22. The justification for the ALJ's conclusion is unclear, as APS regularly referred Rivera to an outside psychologist, Dr. Miguez was aware Rivera was receiving separate treatment at APS, and the two prescriptions were for separate

medications. Ex. 5F at 22, 26, 28, 30; Ex. 10F at 3 (notes from Dr. Miguez referring to "APS"). I do not see why these facts suggest any deception by Rivera.

Rivera also contends that the ALJ should not have rejected evidence from Dr. Miguez based on a discrepancy regarding Rivera's living situation. (Dr. Miguez reported that Rivera lived alone ten days after Rivera reported living with his wife and children.) Rivera appears to have both an ex-wife and contact with a woman who is the mother of his children. Dkt. 22 at 29–30. It is thus reasonable to believe a doctor might not be flawless when recording whether Rivera was with his "wife," "ex-wife," or "mother of his children." But the discrepancy the ALJ identified is nevertheless a discrepancy.

Similarly, Rivera challenges the ALJ's concerns regarding the date Rivera began treatment with Dr. Miguez. The ALJ took issue with the fact that Dr. Miguez first reported seeing Rivera in February 2012, while Rivera first reported seeing Dr. Miguez in May 2012. Rivera testified that he received a prescription from Dr. Miguez at their first visit, but he did not fill that prescription until May 2012. Tr. 47; Ex. 8F at 1. Rivera insists that the ALJ should not rely on the document reporting that he first saw Dr. Miguez in May 2012 because he did not personally sign it. The SSA correctly explains, however, that the document was prepared by Rivera's attorney and therefore attributable to Rivera. Ex. 2E at 1; *Chang v. Smith*, 103 F.R.D. 401, 406 (D.P.R. 1984), *aff'd*, 778 F.2d 83 (1st Cir. 1985) ("[T]he acts and omissions of an attorney acting within the scope of his authority are regarded as the acts of the person he represents."). Again, the ALJ is entitled to consider this inconsistency in assessing the evidence. *See Irlanda Ortiz v. Secretary of Health & Human Services*, 955 F.2d 765, 769 (1st Cir. 1991) ("It is the responsibility of the Secretary to determine issues of credibility and to draw inferences from the record evidence.").

More importantly, substantial evidence nonetheless supports the ALJ's determination that evidence from Dr. Miguez was inconsistent with other medical evidence. For instance, the observations of Rivera's treating physicians at APS are in fact inconsistent with Dr. Miguez's medical report and treatment notes. Dr. Miguez reported that Rivera suffered from psychomotor retardation, difficulty organizing his thoughts and maintaining attention, poor social functioning,

Rivera-Andaluz v. Commissioner of Social Security, Civil No. 18-1298 (BJM)                18

fearfulness, irritability, isolation, and very poor stress tolerance. Ex. 1F at 7–9. He rated Rivera as having a "very poor" prognosis and assigned him a GAF score of 40–45. *Id.* at 10. In contrast, APS physicians regularly found that Rivera appeared clean, alert, and calm; his thoughts logical, coherent, relevant, and oriented; and his affect, introversion, and judgment adequate. Ex. 5F at 21, 23, 25, 27, 29, 31. They consistently assigned him GAF scores ranging from 60 to 65 and described his condition as "stable." Ex. 5F at 22, 24, 26, 28, 30, 34. Rivera asserts that the ALJ erred by failing to consider that he saw APS doctors for brief appointments but visited with Dr. Miguez for more extended counseling. But even if APS physicians saw Rivera for only fifteen-minute appointments, they nonetheless assessed his mental health, prescribed medication to treat his depression, and regularly described him as stable and logical. They consistently described Rivera's symptoms in more positive terms than did Dr. Miguez. Evidence from Dr. Miguez is therefore plainly inconsistent with that from APS.

In short, the ALJ accurately found that some material evidence associated with Dr. Miguez conflicted with other parts of the record. To make a similar fault finding, however, the relevant question is not whether the ALJ properly identified inconsistencies between the evidence under review and other parts of the record.[5] Rather, the relevant question is whether the ALJ properly found by a preponderance of evidence that "the person committing the fault *knew* that the evidence provided was false or incomplete." 81 Fed. Reg. at 13440 (emphasis added). Whether the evidence under review is inconsistent with other record evidence is certainly relevant to a similar fault finding, but that alone is not dispositive. Rather, Congress plainly requires a finding that similar fault only be found where it was committed knowingly. 42 U.S.C. § 405 (u)(B)(2) ("[S]imilar fault is involved with respect to a determination if an incorrect or incomplete statement that is material to the determination is knowingly made or information that is material to the determination is knowingly concealed."). Likewise, the SSA took pains to define the term "knowingly" for its adjudicators. 81 Fed. Reg. at 13440 (defining "knowingly" as "a person's awareness or

_____

[5] The SSA argues only that the ALJ made a finding of similar fault, so I need not address whether this was a case involving "fraud." Dkt. 26 at 15.

understanding regarding the correctness or completeness of the information he or she provides us, or the materiality of the information he or she conceals from us").

Here, the ALJ made no findings as to whether Dr. Miguez or Rivera *knew* that the evidence provided was false or incomplete. Rather, he identified a series of inconsistencies between the evidence provided by Dr. Miguez and other record evidence and determined that "in recognition of the serious inconsistencies," he would disregard evidence from Dr. Miguez. Tr. 22. That the evidence from Dr. Miguez was inconsistent with other parts of the record does not, standing alone, demonstrate that anyone *knew* said evidence was false or incomplete. Compare this situation to the one the SSA uses to illustrate "similar fault" for its ALJs. In its Program Operations Manual System ("POMS"), the SSA illustrates "similar fault" by discussing a situation where a claimant fails to report in her initial disability application that she worked for a second employer. POMS § GN 04020.010(C).[6] When the SSA learned years later that she had worked at said business, she was able to furnish details about that employment. *Id*. The SSA considers it reasonable to conclude that such a claimant knew she worked for that employer and that she knew she should have reported her employment because she was specifically asked about employment on the benefits application. *Id.* Similar is the situation in *Heins v. Shalala*, 22 F.3d 157 (7th Cir. 1994). The claimant in *Heins* had reported to the SSA that she had not remarried, listing "none other" on the section of the application titled "information about each of your marriages." *Id.* at 160. She was in fact remarried. *Id.* at 161. That she *knew* she was married was self-evident, and the SSA could therefore properly make a similar fault finding in the reopening context. *Id.* at 162 ("Norma Jean does not and cannot claim that she did not know of her marriage to Robert Roberts."). In contrast, it is not clear that Rivera knew the evidence he had provided was false or incomplete. He submitted a report completed by his psychiatrist that described his symptoms of depression, a condition from which he certainly suffers. That report described his symptoms in more severe terms than records from his APS physicians. These facts alone are insufficient to show that Rivera or Dr. Miguez

---

[6] POMS, the Program Operations Manual System, can be located online at https://secure.ssa.gov/apps10/poms.nsf/partlist!OpenView.

knowingly submitted false or incomplete information. *Compare Marshall v. Chater*, 75 F.3d 1421, 1424, 1427 (10th Cir. 1996) (upholding fraud or similar fault finding where claimant had repeatedly underreported his earnings and reported working only part-time and seasonally when he was actually working full-time and year-round) *with Barone v. Bowen*, 869 F.2d 49, 51–53 (2d Cir. 1989) (substantial evidence did not support a finding that similar fault was committed knowingly where, although there were discrepancies between claimant's work activity and disability report, his estimates of his earnings were reasonably accurate, some of his misstatements actually went against his interest, and his testimony before the ALJ provided a reasonable explanation for continuing to work while receiving benefits).

The closest the ALJ came to deciding that similar fault was committed *knowingly* was when he concluded that Rivera's filling two prescriptions written by different doctors on the same day "suggest[ed] that the beneficiary was not being fully candid with both physicians about the treatment he was getting from the other." Tr. 22. As explained above, the ALJ's reasoning as to why this fact demonstrates a lack of candor on Rivera's part is unclear. Moreover, even if there was a clear justification for this conclusion, a "suggestion" that Rivera was not being candid with his physicians is not sufficient basis for a similar fault finding because an adjudicator "cannot base a finding of similar fault on speculation or suspicion." 81 Fed. Reg. at 13440.

Because the ALJ failed to make any findings as to whether similar fault was committed "knowingly," his decision to disregard the evidence from Dr. Miguez was not compliant with Congress's mandate as to similar fault findings or the SSA's guidelines. But that does not end the matter. An ALJ, under some circumstances, may still disregard a treating physician's opinion even without a finding of similar fault.

The weighing of inconsistent medical evidence is "a function delegated to the administrative law judge, not to the court on judicial review." *Agostini-Cisco v. Comm'r of Soc. Sec.*, 31 F. Supp. 3d 342, 348 (D.P.R. 2014); *see also Irlanda*, 955 F.2d at 769 (1st Cir. 1991); *Rodríguez Pagán*, 819 F.2d at 3. Where a treating physician offers an opinion on the nature and severity of a claimant's impairment, the SSA may give that opinion controlling weight if it is "well-

supported by medically acceptable clinical and laboratory techniques" and "not inconsistent" with other substantial evidence in the record. *Ormon v. Astrue*, 497 F. App'x 81, 84 (1st Cir. 2012); *Olmeda v. Astrue*, 16 F. Supp. 3d 23, 30 (D.P.R. 2014). An ALJ may reject a treating physician's opinion if it is inconsistent with other substantial evidence in the record. *Agostini-Cisco*, 31 F. Supp. at 347; *Olmeda*, 16 F. Supp. at 30–31 (D.P.R. 2014); *see also Keating v. Secretary of Health & Human Services*, 848 F.2d 271, 276 (1st Cir. 1988) ("A treating physician's conclusions regarding total disability may be rejected by the Secretary especially when, as here, contradictory medical advisor evidence appears in the record."); *Barrientos v. Secretary of Health & Human Servs.*, 820 F.2d 1, 2–3 (1st Cir. 1987).

In this case, the ALJ was faced with a record containing conflicting opinions from different treating physicians: those at APS, who consistently described Rivera as logical, coherent, and with adequate judgment, and Dr. Miguez, who described Rivera's symptoms in more severe terms. The ALJ accurately characterized the ways in which these opinions conflicted and further identified a series of other inconsistencies between the evidence from Dr. Miguez and other parts of the record that made him doubt the reliability of Dr. Miguez's evidence. Given these inconsistencies, the ALJ determined he would give Dr. Miguez's opinion no weight. In so doing, he properly carried out his duty to weigh evidence and resolve conflicts in the medical evidence.

For these reasons, I find that the ALJ's decision to disregard evidence from Dr. Miguez, as one to give a physician's opinion no weight, was supported by substantial evidence.[7]

Rivera next argues that the ALJ's RFC determination is flawed because he failed to properly consider Rivera's sleep apnea, obesity, and gout, and wrongly assessed Rivera's allegations regarding the severity of his symptoms. The Commissioner disagrees on each point but does not address Rivera's arguments regarding his gout. As explained below, the ALJ's

---

[7] Because the ALJ's decision to disregard Dr. Miguez's opinion was supported by substantial evidence, Rivera's argument that the ALJ should not have relied on the opinions of Drs. Justino and Rozelman because they, too, disregarded that evidence is unavailing.

conclusions regarding Rivera's sleep apnea were supported by substantial evidence and any inadequacies related to the ALJ's discussion of gout and obesity do not merit remand.

The ALJ found that Rivera could perform light work as defined in 20 C.F.R. § 404.1567(b), except that he could lift 25 pounds occasionally and 20 pounds frequently; stand or walk for six hours in an eight-hour workday; sit for six hours; never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; and complete simple work with one- or two-step instructions. Tr. 24. In reaching these conclusions, the ALJ credited Rivera's reported symptoms, but not their severity. Specifically, he found that Rivera's reported daytime sleepiness and swelling of the joints could reasonably be caused by his medically determinable impairments but that his reports on the intensity, persistence, and limiting effects of these symptoms were inconsistent with other evidence in the record. *Id.* at 24–25. He also gave great weight to the opinion of non-examining state agency medical consultant Dr. Rabelo, who submitted that he had considered Rivera's severe obstructive sleep apnea, morbid obesity, gout with knee pain, and hypertension and concluded that Rivera could stand or walk for about six hours in an eight-hour day, sit for about six hours in an eight-hour day, occasionally lift 25 pounds, frequently lift 20 pounds, and occasionally crawl, kneel, crouch, and balance. Ex. 3A at 8–10.

Rivera's contention that the ALJ failed to properly account for his sleep apnea is unavailing. The ALJ recognized that Rivera suffered from sleep apnea during the relevant time period, that he was not adhering to the CPAP machine, and that he experienced daytime drowsiness. Tr. 24–25. He nonetheless concluded that, despite Rivera's drowsiness, he could perform light work. This conclusion is supported by the following: Rivera's testimony that his sleep apnea had improved somewhat with CPAP treatment, Rivera's report to his sleep specialist that he was sleeping roughly five to six hours per night, Rivera's report to his physician in October 2013 that he was no longer suffering from daytime sleepiness, regular reports by APS physicians that Rivera was getting adequate sleep throughout the relevant period, and the review of Rivera's physical limitations conducted by Dr. Rabelo. Tr. 43; Ex. 3A at 9; Ex. 3F at 34, 49; Ex. 5F at 21,

23, 25, 27, 29, 31.[8] Although Rivera argues the ALJ "failed to consider [his] reasons for noncompliance with the CPAP machine, resulting in the implicit rejection of his ongoing somnolence," it is not clear that consideration of why Rivera found the CPAP uncomfortable would change the ALJ's analysis.

The primary portion of the record that undermines the ALJ's finding regarding Rivera's drowsiness was Rivera's testimony that he was falling asleep on the machinery at work. As the ALJ explained, however, he credited Rivera's symptom of drowsiness but not the intensity, persistence, and limiting effects he reported. Rivera argues that this "credibility determination" was unsupported by substantial evidence.

In evaluating the intensity, persistence, and limiting effects of a claimant's symptoms, an ALJ must consider (1) whether the claimant's statements are consistent with the objective medical evidence, (2) the claimant's daily activities, (3) the effectiveness and side effects of medication the claimant takes for pain and other symptoms, and (4) other treatment for pain and other symptoms. SSR 16-3p, 82 Fed. Reg 49462 (Oct. 25, 2017). Although SSR 16-3p eliminates the term "credibility" and "clarif[ies] that subjective symptom evaluation is not an examination of an individual's character," the deferential standard of review of an ALJ's evaluation of a claimant's statements remains applicable. *Vito S. S. v. Saul*, No. 2:18-CV-00229-GZS, 2019 WL 2578077, at *2 (D. Me. June 24, 2019), *report and recommendation adopted*, No. 2:18-CV-229-GZS, 2019 WL 3082418 (D. Me. July 15, 2019) (citing *Frustaglia v. Secretary of Health & Human Services*, 829

---

[8] Rivera contends that is was improper for the ALJ to rely on the October 2013 document reporting that Rivera no longer experienced daytime drowsiness. He is correct that on redetermination the time period at issue runs from the disability onset date through the date of the final benefits determination. *See* HALLEX I-1-3-25(C)(3). As such, the period under review only ran until September 21, 2012. However, an ALJ may consider evidence that post-dates the date of the final determination "if it is reasonably related to the time period originally adjudicated." *Id.* at I-1-3-25(C)(4)(c). Here, the October 2013 doctor's visit is reasonably related to the time period originally adjudicated because it sheds light on whether Rivera's difficulty adjusting to the CPAP machine could be resolved and thus whether his somnolence could be expected to last 12 months. *See* 42 U.S.C. § 423(d)(1)(A) (defining disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.").

F.2d 192, 195 (1st Cir. 1987) ("The credibility determination by the ALJ, who observed the claimant, evaluated his demeanor, and considered how that testimony fit in with the rest of the evidence, is entitled to deference, especially when supported by specific findings.")). Here, the ALJ properly found that Rivera's reports of the severity of his drowsiness were inconsistent with the objective medical evidence, which demonstrated that Rivera was getting adequate sleep and that, although Rivera could not initially adhere to the CPAP machine, his physician adjusted the mask size and his symptoms improved to the point where he eventually reported no drowsiness. The ALJ's conclusion that Rivera's drowsiness was not as severe as reported was therefore supported by substantial evidence.

Next, Rivera contends that the ALJ erred by inadequately explaining what role his gout and obesity played in the RFC determination. The ALJ discussed gout only briefly and failed to discuss Rivera's obesity. Nonetheless, neither point merits remand.

An ALJ must consider all the evidence in the record. 20 C.F.R. § 404.1520(a)(3); 20 C.F.R. § 416.920(a)(3). In making an RFC determination, the ALJ "will consider all of [the claimant's] medically determinable impairments," including those that are "not 'severe.'" 20 C.F.R. § 404.1545(a)(2). An ALJ need not, however, "recite every piece of evidence which favor[s] a claimant." *Santiago v. Secretary of Health & Human Services*, 46 F.3d 1114, 1995 WL 30568, at *4 (1st Cir. 1995) (per curiam) (unpublished table decision) (citing *Stein v. Sullivan*, 966 F.2d 317, 319 (7th Cir. 1992)); *see also N.L.R.B. v. Beverly Enterprises-Massachusetts*, 174 F.3d 13, 26 (1st Cir. 1999) ("An ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.").

The ALJ's discussion of Rivera's gout could have been more thorough. In his testimony before the ALJ, Rivera reported that the gout made his joints swell, that it made him feel as if he could not move, and that it was located in his knees, ankles, and feet, which he needed to operate heavy machinery. Tr. 43. Rivera did not testify as to how frequently he experienced bouts of gout, nor did he explain whether gout caused him pain (although his medical records suggest it did). Rivera also testified that his daily activities were minimal but that he would move objects when

Rivera-Andaluz v. Commissioner of Social Security, Civil No. 18-1298 (BJM)                          25

his wife asked him to. *Id.* at 45. Rivera's medical records demonstrate that he had received treatment for gout and related pain on various occasions. *See* Ex. 4F at 19–21, 26–28, 33. None of these records, however, elaborate on Rivera's gout or its effects on his mobility. Finally, Dr. Rabelo, the only physician to discuss Rivera's physical limitations, found that Rivera could perform various physical activities. Ex. 3A at 9. In drawing this conclusion, Dr. Rabelo reported that he had considered Rivera's gout with left knee pain alongside his other impairments. *Id.* at 10. Although the ALJ did not go into great depth in discussing Rivera's gout, he did explain that he had placed great weight on Dr. Rabelo's opinion because it was consistent with the medical evidence and supported by Dr. Rabelo's experience and expertise. Tr. 25–26. He also acknowledged that Rivera reported that he was being treated for gout, which had worsened, that he suffered from swelling of the joints, and that his gout made it difficult for him to move. Tr. 24. Given that the ALJ's opinion referenced Rivera's gout, relied on the medical opinion of a physician who considered Rivera' s gout, and drew conclusions that were consistent with the medical evidence and Rivera's own descriptions of his physical limitations, any inadequacies regarding the depth of the ALJ's discussion of gout do not merit remand. *See Shaw v. Secretary of Health & Human Services*, 25 F.3d 1037, 1994 WL 251000, at *5 (1st Cir. 1994) (per curiam) (unpublished table decision) ("We agree with the district court that while the ALJ did not expressly cite the agency doctors' reports (only the agency findings) he implicitly took them into account. While we would prefer more explanatory detail . . . we see no reason to return this case for the purely formulaic purpose of having the ALJ write out what seems plain on a review of the record.")

Rivera also seeks reversal and remand of the SSA's decision based on the ALJ's failure to discuss his obesity. Although Rivera is correct that the ALJ erred in failing to discuss Rivera's obesity, that error was harmless.

Rivera-Andaluz v. Commissioner of Social Security, Civil No. 18-1298 (BJM)                          26

The SSA does not consider obesity a severe impairment. SSR 16-02-1p, 67 Fed. Reg. 57859 (Sept. 12, 2002).[9] It nonetheless requires adjudicators to account for obesity at various stages of the five-step sequential analysis. For instance, the SSA will find that obesity is a severe impairment where, "alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do work activities." *Id.* at 57861–62. Additionally, the SSA requires that adjudicators "consider an individual's maximum remaining ability to do sustained work activities," noting that "in cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity. This may be particularly true in cases involving sleep apnea." *Id.* at 57862–63.

Rivera's medical records consistently report that he suffers from Level III obesity. *See* Ex. 4F at 19, 22 (reporting a body mass index of 47); 67 Fed. Reg. at 57860 (explaining that Level III obesity includes body mass indices greater than or equal to 40). Despite the requirements of SSR 02-1p, the ALJ made no mention of Rivera's obesity in his decision, other than to note that Rivera was advised to lose weight. The ALJ thus failed to document any "individualized assessment of the impact of obesity" on Rivera's functioning when deciding whether his impairments were severe and failed to account for how obesity might affect Rivera's RFC. 67 Fed. Reg. at 57862.

This failure, however, was harmless because the record contains no evidence that obesity limited Rivera's functioning. To the contrary, Rivera's function report listed no physical limitations, and Rivera made no mention of his obesity in his testimony before the ALJ. Likewise, Rivera's medical records do not mention any physical limitations related to his obesity. Rather, those records simply reflect that Rivera's physicians advised him to increase physical activity, maintain a healthy diet, and lose weight. Ex. 4F at 20, 22. Further, Dr. Rabelo reported that he had considered Rivera's obesity in assessing Rivera's physical exertion limitations and nonetheless found that Rivera could engage in a range of physical activities. Ex. 3A at 9–10. In these

---

[9] Although SSR 02-1p has been rescinded and replaced by SSR 19-2p effective May 20, 2019, SSR 02-1p was in force at the time the ALJ assessed Rivera's obesity. *See* SSR 19-2p, 84 Fed. Reg. 22924 (May 20, 2019).

circumstances, the ALJ's failure to discuss Rivera's obesity was harmless. *See, e.g., Rutherford v. Barnhart*, 399 F.3d 546, 553 & n. 5 (3d Cir. 2005) (finding remand unnecessary where ALJ failed to discuss plaintiff's obesity because plaintiff "never mentioned obesity as a condition that contributed to her inability to work, even when asked directly by the ALJ to describe her impairments" and no medical evidence indicated that obesity contributed to any limitation); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (declining to remand based on ALJ's failure to discuss plaintiff's obesity where plaintiff failed to specify how obesity would impair his ability to work and ALJ had adopted limitations suggested by reviewing physicians who were aware of plaintiff's obesity); *Forte v. Barnhart*, 377 F.3d 892, 896 (8th Cir. 2004) (declining to remand based on ALJ's failure to discuss plaintiff's obesity where, "[a]lthough [the plaintiff's] treating doctors noted that [the plaintiff] was obese and should lose weight, none of them suggested his obesity imposed any additional work-related limitations, and he did not testify that his obesity imposed additional restrictions"); *Connor v. Colvin*, No. CV 14-40163 -TSH, 2016 WL 4358117, at *9 (D. Mass. Mar. 31, 2016) (declining to remand based on ALJ's failure to discuss obesity where plaintiff never identified obesity as a condition that contributed to his ability to work and ALJ relied on physician's opinion who had considered plaintiff's obesity).

In short, the ALJ's conclusions regarding Rivera's ability to perform light work were supported by substantial evidence and any errors regarding the depth of discussion of Rivera's physical impairments were harmless.

### *Administrative Procedure Act*

Rivera next raises two arguments under the APA. First, Rivera argues that redeterminations of SSDI benefits are formal adjudications under the APA and that the hearing he received failed to comply with the APA's requirements for such adjudications. Whether an agency adjudication is a formal adjudication under the APA is rarely, if ever, an obvious point. *See, e.g., Dominion Energy Brayton Point, LLC v. Johnson*, 443 F.3d 12, 14–15 (1st Cir. 2006) (explaining the relevance of *Chevron* analysis in determining whether a statute triggers the APA's formal adjudication requirements). Further, courts that have addressed this question in the context of SSDI

redeterminations have reached varying conclusions. *Compare Hicks v. Comm'r of Soc. Sec*., 909 F.3d 786, 804 (6th Cir. 2018) (treating proceedings under 42 U.S.C. § 405(b)(1) as formal adjudications under the APA) *with Taylor v. Berryhill*, No. 1:16CV00044, 2018 WL 1003755, at *18 (W.D. Va. Feb. 21, 2018) ("Nothing in § 405(u) requires the Agency to provide a formal hearing on the record on the issue of fraud, and, thus, the APA's formal adjudication requirements do not apply."); *Robertson v. Berryhill*, No. CV 3:16-3846, 2017 WL 1170873, at *16 (S.D.W. Va. Mar. 28, 2017) (holding that OIG's finding of fraud was not a formal adjudication); *see also Biestek*, 139 S. Ct. at 1154–55 (citing *Perales*, 402 U.S. at 400) ("Congress intended [Social Security] proceedings to be 'informal' and provided that the 'strict rules of evidence, applicable in the courtroom, are not to' apply."). Despite the inherent complexity of the type of argument Rivera seeks to make, he cites no authority in support of his contention that an SSDI redetermination is a formal adjudication, but merely cites directly to the APA and Social Security Act. Such bald citation to statute is insufficient to raise this argument. *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones."). As such, Rivera has waived this argument under well-established First Circuit precedent providing that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *Id.*

Rivera also argues that the SSA's procedures for redeterminations based on fraud or similar fault are arbitrary and capricious and must therefore be set aside pursuant to 5 U.S.C. § 706(2). As he explains, claimants may dispute allegations of fraud or similar fault where the SSA makes the fraud finding but not where OIG makes that finding. *See* HALLEX I-1-3-25(C)(4)(a) (explaining that where the SSA suspects that a claim involved fraud "an adjudicator can consider a beneficiary's or recipient's objection to the disregarding of certain evidence," but where OIG makes a fraud referral, "adjudicators do not have discretion to reconsider the issue of whether the identified evidence should be disregarded"). The claimant's opportunity to be heard, he argues, is

based on the happenstance of which agency first suspects fraud, a situation that renders the SSA's redetermination procedures arbitrary and capricious.

Regardless of the merits of Rivera's argument, Rivera lacks standing to raise it. To have standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Here, Rivera has not been injured, nor could this court redress the injury to which he refers because he has already received the remedy he seeks.

Assuming without deciding that Rivera is correct that the SSA's procedures are arbitrary and capricious, those who suffered injury as a result are those claimants who had no opportunity to challenge a fraud or similar fault finding by OIG. *See Hicks*, 909 F.3d at 809 (referring to those who could not challenge an OIG fraud finding as having been "procedurally penalized"). Claimants whose redeterminations were based on the SSA's fraud rules were permitted to object to the agency's fraud finding and thus were not injured by the SSA's procedures.

Rivera inaccurately describes himself as among those who could not challenge the fraud or similar fault finding. He is correct insofar as the SSA *initially* redetermined his eligibility for benefits based on a fraud referral from OIG. *See* Ex. 4B at 1; Ex. 5B at 1; Ex. 9B. Under this initial OIG referral, Rivera could not object to the fraud finding. *See* HALLEX I-1-3-25(C)(4)(a). However, after OIG sent a memorandum informing the SSA that Dr. Miguez had pled guilty to a one-count Information and that charges of false statements to SSA had been dismissed, the SSA determined that it would review evidence from Dr. Miguez under its own rules for fraud and similar fault, rather than based on an OIG finding. Tr. 62. Because Rivera's claim involved evidence from Dr. Miguez, it was included in this mass "informal remand." Barry Decl. ¶ 9. The SSA therefore sent Rivera a letter explaining that evidence from Dr. Miguez would be considered under the SSA's fraud rules. Ex. 13B at 5. The letter further explained that Rivera could present his case to an ALJ who would consider the issues Rivera raised, the evidence in Rivera's file, and any additional evidence Rivera submitted about the relevant time period. Ex. 13B at 6. Additionally, the letter

explained that the ALJ at Rivera's hearing would "consider if [evidence from Dr. Miguez in Rivera's file] shows that fraud or similar fault was involved in providing evidence in your case." *Id.* If so, the evidence from Dr. Miguez would be disregarded. *Id.* At his hearing, Rivera presented testimony regarding his treatment with Dr. Miguez. Tr. 40–42, 46–48. The ALJ then provided a written opinion explaining his reasons for disregarding evidence from Dr. Miguez. Tr. 21–22. Rivera appealed this decision to the Appeals Council and then sought review in this court.

As explained above, the ALJ did not make a finding as to whether similar fault was committed "knowingly," but Rivera has not challenged that error. Nor does that error change the fact that the evidence in Rivera's case was reviewed under the SSA's fraud rules, which permit claimants to object to the fraud finding.

In short, although Rivera initially belonged to that group of claimants who could not challenge an OIG fraud finding, the redetermination of his claim was ultimately made under the SSA's fraud rules. As such, he did not suffer the injury to which he refers—the inability to challenge a fraud finding—and he has already received the appropriate redress—the opportunity to challenge the SSA's fraud finding before the ALJ and Appeals Council.

For these reasons, Rivera lacks standing to challenge the SSA's redetermination procedures.

### Due Process

Rivera's due process challenge fails on the same grounds. Rivera devotes a considerable portion of his memorandum arguing why procedures related to OIG fraud findings violate the Due Process Clause, but he does not challenge the constitutionality of procedures where the SSA finds fraud or similar fault. As explained above, Rivera's redetermination was ultimately made based on an SSA fraud or similar fault finding and not based on an OIG fraud finding. Rivera's assertion that the Commissioner "refus[ed] to allow [him] to rebut OIG's assertion of fraud" is factually inaccurate. Dkt. 22 at 20. Rivera states that he wishes to argue before the SSA that "there was no fraud in his particular case, or that no fraud affected his medical evidence." *Id.* at 18. The SSA, however, already permitted Rivera to raise this challenge at his hearing. Tr. 40–42, 46–48. It also

gave him prior notice explaining that the ALJ would consider evidence from Dr. Miguez under the SSA's fraud or similar fault rules and that Rivera could raise relevant issues and present relevant evidence. Ex. 13B at 6; Ex. 14B at 9.

Rivera's due process argument, inapplicable to the facts of his case, must fail.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is AFFIRMED. Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 25th day of September, 2019.

*S/ Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge